**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **JAMES E. CARTER,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **NO. 3:12-CV-01896-BF** |
| | § | |
| **CAROLYN W. COLVIN,** | § | |
| **Commissioner of Social Security,** | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

This is an appeal from the decision of the Commissioner of the Social Security Administration ("the Commissioner") denying the claim of James E. Carter ("Plaintiff") for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). The Court considered Plaintiff's Brief, Defendant's Brief, and Plaintiff's Reply Brief. The Court reviewed the record in connection with the pleadings. For the following reasons, the final decision of the Commissioner is AFFIRMED.

**Background**[1]

**Procedural History**

Plaintiff filed an application for SSI benefits on August 7, 2009. (Tr. 61.) In his application, Plaintiff alleged disability due to heart and back problems and seizure disorder with an onset date of January 1, 2002. (Tr. 59, 61.) Plaintiff's application for disability was denied initially and upon reconsideration. (Tr. 1-3, 19, 62-65.)

Plaintiff requested a hearing, which the ALJ held on July 16, 2010. (Tr. 28-58, 77, 85-90.) Plaintiff, represented by counsel, testified at the hearing along with a vocational expert ("VE"). (Tr.

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

49-57.) The ALJ issued an unfavorable decision denying Plaintiff's disability claim on September 14, 2010. (Tr. 16-27.)

Plaintiff requested review from the Appeals Council, however the ALJ's decision was upheld on April 19, 2012, as the Appeals Council found no basis on which to overturn the ALJ's decision. (Tr. 1-4.) Thus, the ALJ's decision became the final decision of the Commissioner from which Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

### Plaintiff's Age, Education, and Work Experience

Plaintiff was born on March 13, 1956, and was 45 years old on his alleged onset date, January 1, 2002. (Tr. 59.) He obtained a GED, and has no past relevant work experience. (Tr. 26, 31.) Plaintiff was last employed in 2007, except he briefly worked in the kitchen while incarcerated before being removed because of his seizures. (Tr. 34-35, 214.)

### Plaintiff's Medical Evidence

**A.     Relevant Medical Evidence of Plaintiff's Physical Impairments**

Plaintiff claims that he has suffered from seizures since infancy and chronic back pain for the last ten years. (Tr. 224, 340.) There is some documentation for both conditions. *Id.* The Court will summarize the relevant medical evidence.

**1.     Seizures**

During a neurological exam on October 7, 2009, Plaintiff claimed that he has suffered from a seizure disorder since birth. (Tr. 340.)  He did not begin experiencing grand mal seizures, though, until his early 30's following a traumatic head injury, and he reported that his condition was

exasperated by other traumatic head injuries in following years.[2] (Tr. 45, 167-69.) Plaintiff was put

on a prescription anti-convulsion medication regimen which appeared to control his seizures. (Tr.

413.)

In August 2009, Plaintiff completed a self-reported seizure log for the Department of

Assistive and Rehabilitative Services that documented three seizures on August 6, September 12,

and September 26, 2009. (Tr. 152.) However, an out-patient report from Plaintiff's general care

physician, Dr. Imran Akram Rao, dated July 29, 2009, stated that Plaintiff's seizure disorder was

stable on his current medication and his prescription was refilled. (Tr. 413.) Another follow-up

appointment with Dr. Rao on September 21, 2009, also noted that Plaintiff's seizure disorder was

stable on medication. (Tr. 252.) Plaintiff was also examined by a neurologist, Dr. Clemence Yeh,

at Parkland hospital ("Parkland") on October 7, 2009, where he was diagnosed with uncontrolled

tonic-clonic seizures.[3] (Tr. 340-41.) Dr. Yeh's notes suggested that Plaintiff was already prescribed

medication for his disorder prior to this consultation, but that Plaintiff was not taking these

medications consistently.[4] (*Id.*) He was counseled on the importance of anticonvulsant compliance

at this appointment. (Tr. 341.)

---

[2]Plaintiff's  mother provided a statement confirming that Plaintiff started suffering from minor seizures as an infant, but that she witnessed him suffering from grand mal seizures starting in his 20's. (Tr. 150, 340-41)

[3]In Plaintiff's Brief, this consultation is said to have occurred on October 4, 2009 and references Exhibit No. 7F, Dr. Yeh's notes from the consultation. However, the documents themselves are dated October 7, 2009. (Tr. 340.)

[4]This is also noted by Plaintiff in Exhibit No. 4E, paperwork completed for the Disability Determination Services in Austin, Texas, as well as in an out-patient report from July, 2009. (Tr. 151, 413.)

In light of the October 7, 2009 consultation, Dr. Clemence Yeh completed a Seizures Residual Functional Capacity Questionnaire ("RFC questionnaire") in which Dr. Yeh documented that Plaintiff was suffering between 1-2 seizures a week, but was occasionally not taking his seizure medication, Tegretol, which helped control the seizures. (Tr. 154-55.) The questionnaire also reflected that Plaintiff should avoid elevated temperatures as it could be a precipitating factor, and that Plaintiff was not always able to detect when a seizure was about to occur. (*Id.*) As such, Dr. Yeh indicated that Plaintiff might need more supervision at work than an unimpaired co-worker would, that Plaintiff's condition was likely to disrupt the work of co-workers, and that he would sometimes need to take unscheduled breaks in his 8-hour work day. (Tr. 156.) He was also unable to work at heights or with motor vehicles. (*Id.*) While the RFC questionnaire did state Plaintiff would have both "good days" and "bad days" due to his seizures, Dr. Yeh did not speculate as to how often Plaintiff would be absent from work as a result of his seizure disorder, or how often he would need to take unscheduled breaks. (Tr. 157.) Dr. Yeh also did not indicate whether Plaintiff suffered any side effects from the medication, however he did indicate that Plaintiff could travel alone on the bus. (Tr. 156.) Dr. Yeh noted that there were no other limitations such as the ability to sit, stand, walk, lift, bend, etc. that would keep Plaintiff from working a regular job on a sustained basis.(Tr. 157.)

In addition, a case assessment completed by a state agency medical consultant on October 19, 2009, found that Plaintiff's seizure disorder was a "non-severe impairment" and stable with the use of medication, and that Plaintiff's alleged symptoms were not supported by the evidence in his file. (Tr. 293.) A follow-up assessment from another non-examining state agency medical consultant on December  15, 2009, affirmed these findings. (Tr. 294.)

Dr. Yeh ordered an electroencephalography report ("EEG") after Plaintiff's consultation, and it was performed on January 4, 2010 at Parkland's Neurophysiology Center. (Tr. 341, 296.) The EEG monitored Plaintiff awake and sleeping and found "normal" results during both. (Tr. 296.) The report warned that a normal EEG did not exclude the possibility of epilepsy, and that further testing could be done following stress factors that increase the likelihood of seizures, like sleep deprivation, or after Plaintiff had a seizure. (Tr. 296.) The report indicated that a previous EEG completed August 15, 2000, was also normal. (Tr. 296.) Furthermore, doctor's notes from a July 2, 2010 out-patient visit to Bluitt Flowers reflected that Plaintiff's last seizure was 2 months prior to the visit. (Tr. 510.) Additionally, notes from that exam noted that his prescription for Carbamazapine, an anti-convulsant medication, had been increased, but he wasn't taking the increased dosage at the time of the exam. (Tr. 511.)

2.      **Chronic Back Pain**

Plaintiff claims that it was following his release from prison in early 2009 that he first sought medical treatment for his back pain at Parkland. (Tr. 224-25.) Records from Parkland dated February 16, 2009, reflected that Plaintiff came in complaining of back pain that radiated to his right leg beginning after a fall in the shower one month before. (Tr. 260.) He was diagnosed with sciatica during this visit, and was prescribed Toradol for pain. (Tr. 260, 379.)

Plaintiff was seen for a follow-up visit on July 29, 2009, where he reported that his back pain persisted and that his prescriptions were not helping relieve the pain. Plaintiff's medications were therefore adjusted. (Tr. 412.) He had another follow-up examination August 17, 2009, during which X-rays were taken of his lower back. (Tr. 272.) The X-rays revealed osteoarthritis in Plaintiff's lumbar, as well as evidence of degenerative disc disease. (*Id.*) Notes from this examination recorded

Plaintiff's pain level as a dull ache with a 5/10 severity, with 10 being the worst pain. (Tr. 275.) It was also noted that Plaintiff suffered "vague discomfort," that he had normal strength and tone, and that he had normal coordination and gait. (*Id.*) There were no notes regarding Plaintiff's use of or need for a cane. (*Id.*) The notes also reflected that Plaintiff said that his symptoms were alleviated by sitting, and exacerbated by standing, walking, and recumbency. (*Id.*) No new medication was prescribed, and Plaintiff was instructed to take his previously prescribed medications as directed. (*Id.*) Plaintiff was seen for another follow-up visit on September 21, 2009, and he stated that his current medications were not relieving his back pain at that time, and that the pain greatly affected his life. (Tr. 252.) His prescription for Tramadol was discontinued and he was prescribed Lortab. (*Id.*) The outpatient summary report also noted that Plaintiff signed a consent for substance medication management, presumably for the Lortab prescription as it was a narcotic pain reliever, and received a copy for his personal reference. (Tr. 401.)

On October 7, 2008, Plaintiff visited Parkland's neurology department for the first time where he was examined by Dr. Clement Yeh. (Tr. 340-41.) At this appointment, Dr. Yeh's notes focused on Plaintiff's history of seizures, but he did note that Plaintiff had a normal gait and posture, and had full and uniform strength throughout his extremities. (Tr. 340.) Furthermore, Dr. Yeh noted Plaintiff had no joint pain or stiffness. (*Id.*)

A Case Assessment was completed by a state agency consultant, Dr. Scott Spoor, on October 19, 2009, in which Dr. Spoor noted that there was no evidence of arthritis anywhere in Plaintiff's medical records, and that Plaintiff's symptoms were not fully supported by evidence in Plaintiff's file. (Tr. 293.) Dr. Spoor also noted that Plaintiff's use of a cane was not supported, and that he

displayed normal coordination and gait. (*Id.*) Plaintiff's impairments were classified as "non-severe." (Tr. 293.) These findings were affirmed by Dr. Laurence Ligon on December 15, 2009. (Tr. 294.)

On December 22, 2009, Plaintiff presented to the Parkland Emergency Room complaining of stabbing back pains in his lumbar spine that radiated into his left knee. (Tr. 303.) The pain was moderate according to the notes in the report, and Plaintiff needed a refill for his pain medications. (Tr. 302-03.) Following this visit, Plaintiff began physical therapy at Parkland on December 28, 2009, at which time Plaintiff reported experiencing pain reaching 9/10 on a pain scale with 10 being the worst pain, and required modification on all exercises. (Tr. 297.) He reported walking and bending as aggravating factors, and lying down as an alleviating factor. (*Id.*) The therapist also noted Plaintiff was using his cane incorrectly, and instructed him on proper use. (*Id.*) On December 31, 2009, Plaintiff returned to physical therapy where he reported pain reaching 8/10 on a pain scale, but reported doing no exercise in the last week. (*Id.*) In his third and final physical therapy session on January 18, 2010, Plaintiff still reported pain reaching 8/10 on a pain scale, but met the overall goals prescribed to him by the physical therapist, and he increased his "functional level" from 40 percent to 80 percent. (Tr. 298.) The notes from this session indicated that the therapist reiterated the importance of building strength by continuing the activities taught in the course. (*Id.*) Plaintiff was issued a certificate confirming that he passed the "Back in Action" physical therapy class at Parkland on January 18, 2010. (Tr. 230.)

Plaintiff was again seen on January 21, 2010 for back pain, this time reporting that pain radiated into his lower left leg. (Tr. 384.) Dr. Rao was again the treating physician, and he recommended rest, applying heat, and taking pain medications as prescribed. (Tr. 387.) He also told Plaintiff to schedule a magnetic resonance imaging test ("MRI") for Plaintiff's lower back and

provided him with the phone number to call for scheduling. (*Id.*) Plaintiff was seen by Dr. Rao again on May 20, 2010, at which point Dr. Rao recorded Plaintiff's lower back pain as being stable on the current pain medicine and noted that Plaintiff still needed to schedule an MRI for his lower back. (Tr. 470-71.)

Plaintiff's MRI was completed on June 17, 2010 at Parkland. (Tr. 506.) The report reflected mild diffuse disc bulge in two locations and moderate disc bulge in another location on Plaintiff's spine, but the "Result Impression" showed that while Plaintiff suffered from mild multilevel degenerative changes in the lumbar spine, the MRI was otherwise unremarkable. (Tr. 506.) These findings were reviewed and confirmed. (*Id.*) The last significant medical record was completed February 25, 2011 when Plaintiff was seen again for his chronic back pain. (Tr. 524.) The outpatient report noted that he was receiving steroid shots for the pain at the pain clinic, but Plaintiff complained that his elbow and knee also hurt, and he requested his hydrocodone prescription be doubled. (*Id.*) The treating physician declined this request, but instead added a prescription of Etodolac. (*Id.*)

### 3.  **Hypertension**

Plaintiff provided documentation of a two-dimensional transthroacic echocardiogram completed on April 28, 2009, after Plaintiff complained of chest pains, which contained normal results. (Tr. 250-51.) Plaintiff's medical records routinely noted normal cardiovascular, pulmonary, and chest examinations, and no additional treatment for hypertension beyond consistent prescription medications. (Tr. 257, 268, 424, 495.) Furthermore, notes in medical records dated between July 29, 2009 and May 20, 2010, as well as Plaintiff's Case Assessment on October 19, 2009, noted that his hypertension was stable. (Tr. 239, 257, 268, 424, 495.)

**Plaintiff's Testimony at the Hearing**

Plaintiff, represented by counsel, testified on his own behalf at the hearing held on July 16, 2010. (Tr. 30-58.) Plaintiff testified that he is unable to work because of chronic back pain, arthritis in his joints, and a seizure disorder. (*Id.*) He reported being incarcerated for much of 1999-2009, and had not held a job since being paroled in February 2009. (Tr. 32-33.) While he previously worked as a welder and a machinist, Plaintiff testified that he did not have recent work experience outside of a kitchen job he briefly held while in jail. (Tr. 34.) He testified that he was released from that job because of his seizures. (Tr. 34-35.)

Plaintiff reported having severe back pain that made daily tasks, like dressing, difficult, and also limited his mobility and required him to use a cane. (Tr. 41.) He testified that, while he started using the cane on his own before attending physical therapy at Parkland in January 2010, the physical therapist both provided him a new cane and instructed him on how to use it properly. (Tr. 37.) At physical therapy, Plaintiff said he was primarily informed about the details of his sciatica condition, including that if he bent over too far he would be injured to the point of bed rest for multiple days. (Tr. 41.) He denied much physical improvement from the physical therapy exercises he learned despite his testimony that he continued to attempt the exercises at home. (*Id.*) He also testified that when his sciatica was aggravated he would be unable to even turn over in bed, and that he would have to use a "urinal" because he was unable to make it to the bathroom. (*Id.*)

Plaintiff also testified that he was limited in his ability to both sit and walk. (Tr. 42) He claimed that he was unable to sit for more than 30 minutes at a time without getting stiff and experiencing back pain that traveled from his lower back to his right hip. (*Id.*) In addition, Plaintiff claimed to suffer from arthritis in his knee and elbow joints, as well as his upper neck while sitting

or lying down. (Tr. 42, 48-49.) He also testified to having limited mobility, and not being able to stand for more than 30 minutes at a time or walk more than 100 feet without the aid of his cane due to the pain he experienced. (Tr. 43.)  He stated he thought he could sit for approximately four hours, and stand for approximately three hours out of a normal work day. (Tr. 44-45.) He also testified that bending and lifting were uncomfortable for fear of straining his back. (Tr. 44.) Lifting more than 10-12 pounds also put him in fear of throwing out his back, and he had to hold on to something while putting his pants on because he couldn't bend over. (*Id.*) In addition, Plaintiff reported lying down approximately three times every morning for 30-40 minutes, though he said he was unable to stay in one position for too long without becoming uncomfortable. (Tr. 43.) He stated that he was taking pain medications for "a long time" to help with the pain, but that he just recently began taking hydrocodone. (Tr. 35.)

Plaintiff also testified that his seizures were unpredictable and debilitating. (Tr. 46.) Though mild at first, he started getting grand mal seizures when he was approximately 31 years old after being hit in the head with an 85-pound construction bar which "cracked [his] skull." (Tr. 45.) At the time of the hearing he said he could not drive because of the risk his seizures posed, as it was not possible to predict when they would occur because they were preceded only momentarily by what Plaintiff described as the smell of blood. (Tr. 41, 46-47.) He testified that he got multiple seizures over varied intervals, and that the frequency was based on how regularly he took his medication. (Tr. 47.)

When questioned by the ALJ about his inconsistency in taking his anticonvulsant medication, Plaintiff replied that sometimes he would refrain from taking his medication because the side effects made him feel slow and unable to cope in certain situations. (Tr. 47.) He claimed that he would only

refrain from taking his medications a couple of times per month for events such as the hearing, at which he could not feel "slow" and tired. (Tr. 47-48.) As such, Plaintiff testified that his seizures were not under control despite the medication he was taking. (Tr. 40, 46.) He stated that he thought the notes in his medical records indicating that his seizures were stable on his current medication were recorded during hospital visits for his heart condition, not appointments specifically concerning his seizure disorder. (Tr. 46.) Plaintiff testified that his doctor was in the process of adjusting his medications because he was still having seizures, but also stated later in the hearing that the reason his doctor was attempting to change his medication was because of the side effects that clouded his thinking. (Tr. 46, 48.) Plaintiff stated that he previously had an EEG performed because of his seizures that produced normal results, but he also stated that he was waiting for his doctor to schedule an MRI scan for further testing. (Tr. 40-41.)

Plaintiff also testified that the heart problems he previously experienced were controlled by medication and the termination of his cocaine use, but that he still suffered a ringing in his ears following the car accident in which he sustained head injuries. (Tr. 34, 39-40, 57.) Plaintiff said he was scheduled for a future appointment with a doctor for the ringing in his ears.

**The Hearing**

The VE, Dr. Vander-Molen, also testified at the hearing. (Tr. 49-58, 110-12.) The ALJ posed a hypothetical question to the VE. (Tr. 49-50.) The VE responded that an individual of Plaintiff's age with a GED and no relevant work experience, who was limited to light work with postural and environmental limitations of no climbing of ladders, ropes, scaffolds or other unprotected heights; no moving around hazardous machinery or operating automotive equipment; no more than simple, routine, or repetitive tasks; and no jobs that require a production or rapid rate pace would be able to perform some jobs within the national economy.[5] (Tr. 49-50.) He testified that such an individual could perform jobs such as an electronics worker, usher, or cleaner/housekeeper. (Tr. 50.) The VE stated there were approximately 100,000 electronics jobs, 50,000 usher jobs, and 300,000 cleaner/housekeeper jobs in the national economy, with approximately ten percent of each being in Texas. (Tr. 50-51.) All three of these jobs were classified as light work and unskilled according to the Dictionary of Occupational Titles ("DOT"). (*Id.*)

Upon cross-examination by Plaintiff's counsel, the VE was asked to adjust the ALJ's hypothetical in various ways. (Tr. 52-56.) First, the VE testified that the production rate for the jobs he found Plaintiff qualified to perform was not particularly important, but that if the hypothetical was changed to include an individual whose work pace was too slow due to medications or arthritis to accomplish the work required in an eight-hour work day, the individual would likely be precluded

---

[5] Light work is defined as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying up to 10 pounds. Even though the weight lifted may be very little, a job in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities. 20 C.F.R. § 404.1567(b)

from employment. (Tr. 53-54.) Second, the VE testified that if the individual in the hypothetical needed to walk with a cane at all times, that individual would not likely be able to complete light work. (Tr. 53.)  However, if the individual only required the cane to ambulate from one job setting to another and then no longer required the assistance of the cane to perform the light work there would be no conflict. (*Id.*) Third, the VE stated that an individual needing to lie down for more than an hour during the work day would likely be precluded from performing any light work. (Tr. 54.) Fourth, the VE considered whether an individual that could not bend or stoop would be able to perform any of the jobs that he found the individual in the original hypothetical able to perform, and concluded that in such circumstances the electronics worker and cleaner/housekeeper jobs would be eliminated. (*Id.*) Fifth, the VE found that if there were additional extreme temperature limitations added to the original hypothetical, approximately 50 percent of the usher jobs both in the general national and Texas markets would be eliminated because they would not be climate controlled environments. (Tr. 54-55.) Sixth, the VE testified that an individual requiring a low-stress environment would not have an issue performing any of the three jobs originally approved in the hypothetical because they were all unskilled jobs. (Tr. 55-56.) Finally, the VE found that none of the jobs would be especially loud and unavailable to someone with a hearing impairment. (Tr. 56.)

**The Decision**

In the September 14, 2010 decision, the ALJ found at step one that Carter had not engaged in any substantial gainful activity since his application date. (Tr. 21.) At step two, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc and joint disease of the lumbar spine, seizure disorder, and hypertension. (*Id.*) At step three, the ALJ found that none of Plaintiff's impairments met or equaled any of the impairments for presumptive disability. (*Id.*) The ALJ also found that, despite the impairments Plaintiff suffered, he still had the residual functioning capacity ("RFC") to complete light work, which included lifting up to ten pounds frequently and up to 20 pounds occasionally. (Tr. 26.) Light work can also include a great deal of walking or standing, but the ALJ found that Plaintiff was limited to no climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps and stairs; no more than occasional balancing, stopping, kneeling, crouching, or crawling; no exposure to unprotected heights or moving or hazardous machinery; no operation of automotive equipment; and, due to the side effects of his medication, was limited to simple, routine, repetitive tasks requiring no production/rapid rate pace. (*Id.*) At step four, Plaintiff had no relevant past work experience to consider. (Tr. 21-22.) With these limitations in mind, at step five, the ALJ found that Plaintiff could perform unskilled, light work jobs such as an electronics worker, usher, or cleaner/housekeeper and therefore was not disabled under the meaning of the Act. (Tr. 26-27.)

**Standard of Review**

To be entitled to social security benefits, a plaintiff must prove that he is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social

14

Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied

either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. However, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Moreover, the terms of 20 C.F.R. § 404.1527 define "medical opinions" and instruct claimants how the Commissioner will consider the opinions.[6] In the Fifth Circuit, "the opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses,

---

[6] The terms of 20 C.F.R. § 404.1527(a)(2) provide:

(2) Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

should be accorded great weight in determining disability." *Newton*, 209 F.3d at 455; *see Floyd v. Bowen,* 833 F.2d 529, 531 (5th Cir.1987).

## Issues

1.      Whether the ALJ's RFC findings were supported by substantial evidence.

2.      Whether the ALJ improperly failed to give a treating physician's medical opinion controlling weight.

## Analysis

### Whether the ALJ's RFC findings were supported by substantial evidence[7]

Plaintiff first argues that the ALJ's RFC findings were not supported by substantial evidence because the ALJ failed to fully develop the record when she did not seek an additional medical report regarding the effect of Plaintiff's back injuries on his ability to work. (Pl.'s Br. at 7.) The ALJ has the responsibility of fully developing the record. *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). If the Court determines that the ALJ did not fulfill its duty to develop the record, reversal is still only appropriate if the plaintiff can show that he was prejudiced by the ALJ's improper development of the record. *Newton*, 209 F.3d at 458. Prejudice exists when the plaintiff shows the ALJ's conclusion might have been different based on the information that "could and would" be added to the record. *Kane,* 731 F.2d at 1220. Further, ALJ's have a special duty to seek additional medical information in certain situations. *See Cornett v. Astrue*, 261 Fed. Appx. 644, 647 (5th Cir. 2008). This duty is outlined by statute, and requires that the ALJ seek additional medical evidence pertaining to the plaintiff's ability to complete work-related activities when the information provided by medical sources is inadequate to determine whether or not the plaintiff is disabled. *See* 20 C.F.R.

---

[7]Some of the following arguments are taken from Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, later designated as "Pl.'s Br."

§ 416.912; *see also Cornett,* 261 Fed. Appx. at 648. In such cases, the ALJ can request a medical source statement commenting on the limitations a plaintiff's injuries have on his ability to work, but the absence of such a statement does not in itself make the record incomplete. *Newsome v Barnhart*, No. 3:03-CV-3030-D, 2004 WL 3312833, at *3 (N.D. Tex. Oct. 8, 2004); *Ripley v Chater,* 67 F.3d 552, 557 (5th Cir. 1995). If this medical statement is absent from the record, the Court looks to whether there is substantial evidence supporting the ALJ's conclusion. *Newsome,* 2004 WL 3312833, at *3; *Ripley,* 67 F.3d at 557.

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley,* 67 F.3d at 555 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (5th Cir. 1971); *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993)). The evidence must be enough that a reasonable mind could find that it adequately supports the ALJ's conclusion. *See Richardson*, 402 U.S. at 401. Further, the Court will not substitute its own judgment for that of the ALJ, but will instead look at the record as a whole to determine whether or not there was substantial evidence to support the conclusion drawn. *See Cornett*, 261 Fed. Appx. at 649.

It is the ALJ's sole responsibility to weigh the evidence and formulate a plaintiff's RFC. *See Newton*, 209 F.3d at 452. As such, when the medical evidence that is available shows that a plaintiff suffers little physical impairment, the ALJ is permitted to render a common-sense judgment about the Plaintiff's RFC in the workplace. *Newsome,* 2004 WL 3312833, at *3. Here, the ALJ used the totality of the record, including general physician and specialist's observations and conclusions, to determine the severity of the Plaintiff's pain and RFC. (Tr. 22-25.) Plaintiff contends that the only

18

available statement the ALJ had regarding Plaintiff's RFC was Plaintiff's own testimony at the hearing, similar to the facts in *Ripley*, which alone cannot be considered substantial evidence. *See Ripley*, 67 F.3d at 557 (concluding that the ALJ did not develop the record fully when basing an RFC determination on the plaintiff's testimony alone). However, in *Ripley,* there was no RFC assessment whatsoever completed by any doctor. *Id.* There was also objective medical evidence supporting the plaintiff's claims of severe pain that was seemingly ignored and there appeared to be no evidence that the plaintiff's condition was ever stable. *Ripley*, 67 F.3d at 554-55. Because of this evidence, the court concluded a more direct statement regarding the impact of the plaintiff's injuries on his ability to work was needed before a conclusion could be drawn. *Id*. at 557.

In the case at hand, the ALJ pointed to numerous medical sources that she relied on in addition to Plaintiff's statement in reconciling Plaintiff's condition with his ability to work, and repeatedly noted the lack of objective medical evidence supporting Plaintiff's claims regarding the severity of his pain. (Tr. 23-25.) The ALJ recognized that there was a consistent record of reported pain and treatment in medical records throughout 2009, but she also considered doctors' notes regarding these treatments. (Tr. 23-24.) Most of the records noted consistent strength in Plaintiff's legs, as well as normal gait and posture. (Tr. 24.) The ALJ further pointed to an X-ray and MRI completed for Plaintiff's lower back, the results of which were both normal except for showings of osteoarthritis and mild degenerative disk disease. (Tr. 23-24.) A Case Assessment Form completed October 19, 2009, concluded that Plaintiff's symptoms were unsupported by the evidence in his file, as was the need for a cane. (Tr. 293.) In that assessment, Plaintiff's impairments were categorized as "non-severe." (*Id.)* The ALJ also noted that the final follow-up visit with Dr. Rao provided in the record showed Plaintiff's back pain was "stable" on his medications. (Tr.24.) Finally, though Dr.

19

Yeh focused on the diagnosis and treatment of Plaintiff's seizures, the RFC questionnaire that Dr. Yeh completed stated that Plaintiff had no other limitations that would affect his ability to work, including his ability to sit, stand, walk, lift, bend, or stoop. (Tr. 157.) Thus, Plaintiff's argument that his RFC was determined only based on his own statements is misplaced and the facts at hand are distinguishable from *Ripley*.

The ALJ found Plaintiff's claims regarding the severity of his pain unpersuasive because of the doctors' notes in Plaintiff's medical records regarding his condition that contradicted his statements, the lack of corroboration for his self-reported medical history, inconsistencies between his hearing testimony and his previous reports regarding his functional ability, his sporadic employment prior to his disability onset date, his non-compliance with his prescription medication, his history of cocaine abuse, and his felony record. (Tr. 24, 25.) For example, doctor's notes recorded Plaintiff's condition as stable, though Plaintiff claimed at his hearing that he rarely left the house because of the severity of his pain. (Tr. 43, 470-71.) This statement also contradicts prior reports by Plaintiff that he got out of the house on a regular basis. (Tr. 160.) Furthermore, in a statement prepared for his attorneys, Plaintiff claimed to have suffered multiple accidents that resulted in his back problems, including two severe car accidents and two incidents while in prison, but he offered no documentation for any of the events or evidence of treatment. (Tr. 224-25.) Plaintiff also initially failed to schedule an MRI for his lower back as he was advised to do by Dr. Rao in January 2010, and complained in that visit that the pain radiated into his lower left leg. (Tr. 384-85.) However, at his hearing Plaintiff testified that he had only ever had pain in his right side. (Tr. 49.) Plaintiff also demonstrated a history of medication non-compliance with his seizure medication, and testified at

his hearing that his cocaine use was so severe that in Spring of 2009 his doctors told him if he didn't stop using cocaine he would die. (Tr. 34, 47-48.)

In addition, the ALJ discredited Plaintiff's reports that he needed a cane because Plaintiff admitted that he was not prescribed a cane or originally instructed to use one by a doctor in a self-report attached to Dr. Yeh's RFC questionnaire. (Tr. 158.) Outpatient reports consistently noted his normal gait and posture, and lacked any notation about the use of a cane except for those for Plaintiff's first medical examination in February 2009, and his first physical therapy session in December 2009. (Tr. 24.) However, it was only after Plaintiff's physical therapist noted that he was improperly using a cane with an incorrect fit that Plaintiff was given a proper cane and instructed on how to use it. (Tr. 297.) It is fully within the ALJ's discretion to make determinations about Plaintiff's claims of pain based on medical reports and inconsistent reports regarding Plaintiff's daily activities. *See Brown v. Apfel,* 192 F.3d 492, 500 (5th Cir. 1999).

The Court finds that substantial evidence supports the ALJ's RFC formulation. In making her decision, the ALJ considered roughly 532 pages of medical evidence, which this court can hardly find to be inadequate. *See Cornett,* 261 Fed. Appx. at 648 (holding 500 pages of medical evidence, which included multiple physician's opinions, to be an extensive record and not "inadequate" for purposes of obtaining additional evidence). The ALJ considered an RFC assessment performed by Dr. Yeh as well as numerous medical records provided by Dr. Rao. Further, the ALJ discredited Plaintiff's complaints of pain because they were not corroborated by objective medical evidence. Subjective complaints must be corroborated by objective medical evidence. *Chambliss v. Massanari,* 269 F.3d 520, 522 (5th Cir. 2001). The Court finds that the ALJ fulfilled her duty to develop the

record and it was not necessary for the ALJ to obtain an additional medical report regarding Plaintiff's back injuries and his ability to work. Accordingly, substantial evidence supports the ALJ's RFC and ultimate decision.

### Whether the ALJ failed to follow the Treating Physician Rule

Plaintiff next contends that the ALJ improperly failed to give a treating physician's medical opinion controlling weight. (Pl.'s Br. at 11.) Typically, a treating physician's opinion regarding a plaintiff's impairment and RFC is awarded great weight, and in some cases should be given controlling weight if the opinion is well-supported by other clinical and laboratory diagnostic techniques, and is not inconsistent with other medical evidence in the record. *See Newton,* 209 F.3d at 455; *Greenspan*, 38 F.3d at 237. However, the ALJ is allowed to give a treating physician's opinion less weight, and even disregard a treating physician's opinion completely in some circumstances. *Brown,* 192 F.3d at 500. For an ALJ to discount the weight of a treating physician's opinion, the ALJ must show good cause, which is established when the ALJ shows the treating physician's opinions are conclusory; unsupported by medical, clinical, laboratory, or diagnostic techniques; or otherwise unsupported by the evidence. *Newton*, 209 F.3d at 456. Additionally, the ALJ can discount the opinion of a treating physician relative to another expert if the treating physician's opinions are not well supported by the evidence. *Id.* If a contradictory opinion from another expert does not exist, Social Security Administration ("SSA") regulations require the ALJ to consider specific factors before deciding that a treating physician's opinion will not be given controlling weight.[8] *Id.*

---

[8]SSA regulations require ALJ's to consider: 1) the physician's length of treatment of the plaintiff, 2) the physician's frequency of examination, 3) the nature and extent of the treatment

In the case at hand, Plaintiff argues that the ALJ "wholly ignored" the RFC provided by Dr. Yeh, the neurologist that Plaintiff saw once after initially filing for disability, and failed to provide the required explanation for doing so. (Pl.'s Br. at 12.) However, in this case the ALJ did give Dr. Yeh's diagnosis great weight. The court has rejected strict rules of articulation in ALJ's opinions, and here the content of the ALJ's opinion makes it clear Dr. Yeh's conclusions were considered and adopted by the ALJ, even if not expressly named and labeled as such. *See Falco v Shalala,* 27 F.3d 160, 164 (5th Cir. 1994). First, the ALJ found that Plaintiff's seizure disorder was a severe impairment, based on Dr. Yeh's diagnosis. (Tr. 21.) Additionally, the ALJ specifically references an appointment with a neurologist on October 7, 2009, which, based on the record, must be the appointment with Dr. Yeh. (Tr. 24, 340.) From that report the ALJ mentioned Plaintiff's self-reported history of seizures, that the doctor's neurological exam revealed no abnormalities, that Plaintiff's blood work showed subtherapeutic anticonvulsant levels and positive cocaine urine toxicology, and that Plaintiff was diagnosed with generalized tonic clonic seizure disorder that was uncontrolled with weekly seizures. *Id.* In addition, the ALJ noted that an EEG was also ordered based on this examination, and came back with normal results. *Id.*

The record indicates that Dr. Yeh's RFC questionnaire was based on the notes from that visit, and described a variety of limitations, including an inability to drive or operate power machines and other motor vehicles, memory problems, and an inability to work at heights. (Tr. 155-57.) While Dr. Yeh said that fever or elevated temperatures were precipitating factors for Plaintiff's seizures, he also

---

relationship, 4) the support of the physician's opinion afforded by the medical evidence of record, 5) the consistency of the opinion with the record as a whole, and 6) the specialization of the treating physician. *See* 20 C.F.R. § 404.1527(d)(2); *Newton,* 209 F.3d at 456.

said that avoiding temperature extremes was not a limitation that would affect Plaintiff's ability to work. (Tr. 155, 157.) Dr. Yeh also indicated that Plaintiff would have good days and bad days with his seizure disorder, he needed more supervision at work, and that his seizures would likely disrupt co-workers. *(Id.)* Instead of ignoring or rejecting these limitations like Plaintiff contends, the ALJ expressly included many of them in her RFC assessment of Plaintiff. (Tr. 26.) The ALJ specifically excluded Plaintiff from working at heights, with hazardous machinery, or operating automotive equipment; and required that Plaintiff be limited to "simple, routine, repetitive tasks" that do not require a rapid rate of production or pace due to Plaintiff's reported, but unsubstantiated, side effects of his medication. *(Id.)*

However, the ALJ recognized that Dr. Yeh's RFC questionnaire also clearly noted that Plaintiff reported not taking his seizure control medication at times and he had a history of subtherapeutic levels of the medication in his blood, and had "suboptimal seizure control" at the time of the exam. (Tr. 24.) Dr. Yeh also refrained from answering some questions on the RFC questionnaire, including how often Plaintiff's condition would affect his work or what kind of stress Plaintiff could handle, and answered he was unsure how often Plaintiff would need to take unscheduled breaks or for how long. (Tr. 155-57.) Furthermore, Plaintiff's self-report attached to the questionnaire reflected that Plaintiff felt he could follow written and spoken instructions well, and that he was able to do things like read, housework, and handle a checkbook. (Tr. 159-61.) He also indicated that he tried to get out of the house as much as possible to do things to help his household, shop, and visit friends and family. (*Id.*) In light of these reports, the ALJ also considered the more recently provided medical evidence and opinions regarding the status of Plaintiff's seizure disorder. (Tr. 24.)

In her findings, the ALJ gave great weight to some of the conclusions from Dr. Yeh's one-time examination of Plaintiff. However, the ALJ also found good cause to discredit others due to the medical records from Plaintiff's on-going check-ups with Dr. Rao, the objective medical evidence of the EEG, and the lack of corroborating evidence in support of Plaintiff's self-reported history of his seizure disorder. (Tr. 24.) For example, the ALJ noted that there were consistent progress notes from Bluitt Flowers reflecting that Plaintiff's seizure disorder was stable and EEG results were normal. (*Id.*) While these medical reports conflicted with Dr. Yeh's opinion that Plaintiff's seizures were suboptimally controlled, the ALJ further pointed to the fact that Plaintiff was not taking his medication as instructed at the time of Dr. Yeh's examination, and that Dr. Yeh's report was based on Plaintiff's unsubstantiated, self-reported medical history which gives the opinion less weight. *See Greenspan*, 28 F.3d at 238 (noting that medical opinions based on the plaintiff's self-reported history will not be afforded the same weight as an opinion based off of first-hand observation). Plaintiff testified at his hearing that the level to which his seizures were controlled depended on how regularly he took his medication, and he testified that he did not take it sometimes. (Tr. 47.) Treatment notes also corroborated Plaintiff's non-compliance with his seizure medication. (Tr. 340-41.) An impairment that can be controlled or remedied by medication or therapy cannot serve as a basis for a finding of disability. *See Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

Furthermore, outpatient reports from Parkland leading up to Dr. Yeh's examination show that Plaintiff's seizure disorder was "stable." (Tr. 252, 413.) Although Plaintiff provided a seizure self-report in which he documented nine seizures, one being a grand mal seizure, between May 2 and June 11, 2010, an outpatient report from July 2, 2010 stated that Plaintiff's last seizure was two months prior to the hospital visit. (Tr. 501-02, 511.). The ALJ also noted that Plaintiff never

provided paramedic or emergency room treatment records for seizures, or even statements from witnesses, though Plaintiff claimed that he was treated multiple times by paramedics and healthcare professionals and commonly had major seizures in public. (Tr. 24-25.) Additionally, Plaintiff did not provide any documentation for the multiple accidents and serious assault he reported that he suffered, and which he claimed spurred the onset of his more severe grand mal seizures. (Tr. 167-68.) There is no other objective medical evidence to support the conclusions of Dr. Yeh that were discredited by the ALJ, and Plaintiff's subjective complaints do not suffice. *See Chambliss,* 269 F.3d at 522. Here, there was no objective evidence to support the Plaintiff's reports of the severity or frequency of his seizure disorder, and in fact there were medical opinions that contradicted the reported severity of Plaintiff's condition. (Tr. 24.) As such, the ALJ concluded that while Plaintiff did suffer from the severe impairment of a seizure disorder, he was capable of performing light work with prudent limitations since the disorder appeared to be controllable with medication. (Tr. 26.)

The ALJ accorded great weight to some opinions of Dr. Yeh and provided requisite good cause to discredit others. The ALJ therefore followed the treating physician rule and substantial evidence supports her decision.

### Conclusion

For the foregoing reasons, this Court AFFIRMS the Commissioner's final decision and dismisses Plaintiff's complaint with prejudice.

SO ORDERED, July 2, 2013.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE